IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

————————————————————————————————————

UNITED STATES OF AMERICA,            )
                                     )
      Plaintiff,                     )
                                     )
v.                                   )        No. 17-20023-SHM-tmp
                                     )
ANTWOINE MALONE,                     )
                                     )
      Defendant.                     )

————————————————————————————————————

REPORT AND RECOMMENDATION

————————————————————————————————————

On January 26, 2017, a federal grand jury returned a one-count indictment charging defendant Antwoine Malone with being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). (ECF No. 2.) Before the court is Malone's Motion to Suppress, filed on April 21, 2017. (ECF No. 26.) The government filed its response on May 5, 2017. (ECF No. 28.) Malone seeks to suppress the two firearms identified in the indictment on the grounds that they were seized during an unconstitutional search of his home on July 13, 2016.[1] He also seeks to suppress statements he made to the police while in custody because he allegedly was not informed of his Miranda rights prior to being questioned. Pursuant to an order of reference, on May 23, 2017, the undersigned magistrate judge

————————————————

[1]The indictment charges Malone with possessing a Jimenez .380 caliber pistol and a Taurus .45 caliber pistol. (ECF No. 2.)

conducted a suppression hearing. The court heard testimony from five witnesses: Officer Nicholas McCarroll, Officer James Kendrick, and Sergeant Dennis Brunson of the Millington Police Department, Officer Clint Dixon of the Fayette County Sheriff's Department, and Malone. The court received into evidence three exhibits.[2] A transcript of the hearing was filed on June 26, 2017. (ECF No. 33.)

For the reasons below, it is recommended that the Motion to Suppress be denied.

## I. PROPOSED FINDINGS OF FACT

### A. The Events of July 13, 2016

At approximately 9:00 p.m. on the evening of July 13, 2016, the Millington Police Department received a call from a woman who stated she had been the victim of a domestic assault at a residence on North End Road in Millington, Tennessee ("the residence"). The victim drove to a nearby shopping center with her three-year-old son after the alleged domestic assault, and Officers McCarroll and Dixon were dispatched to meet her there. The victim told the officers that her husband, Antwoine Malone, pulled a gun on her after becoming angry and agitated during an argument at the residence. The officers testified that the victim was scared and frantic when they spoke to her.

---

[2]At the time of the events in question, Officer Dixon was an officer with the Millington Police Department.

While Officers McCarroll and Dixon met with the victim at the shopping center, Officer Kendrick was dispatched to the residence.  At the hearing, Officer Kendrick and Malone gave different accounts of what happened when Officer Kendrick arrived at the residence.  According to Officer Kendrick, when he pulled up to the residence, Malone was standing in front of a car parked in the carport.  Officer Kendrick testified that the non-emergency lights and spotlight on his patrol car were on, but his blue lights and siren were off.  When Officer Kendrick got out of the patrol car and attempted to speak with Malone about the alleged domestic assault, Malone acted "shifty," then turned and entered the residence.  (ECF No. 33 at 27.)  Upon seeing Malone enter the house, Officer Kendrick assumed a defensive position behind the car in the carport, but did not draw his gun.  Officer Kendrick estimated that Malone stayed in the residence for approximately twenty seconds before reemerging unarmed.  Officer Kendrick was then able to speak with Malone, and although Malone was still acting "shifty," he was cooperative.  Around this time, Officer Dixon arrived on the scene.  The officers, out of concern for their safety, conducted a pat-down search of Malone and found a small bag of marijuana in his pocket.  The officers then handcuffed Malone and placed him in the back of a patrol car.  Officers Kendrick and Dixon both testified that they did not at any point draw their

-3-

weapons.

Malone, on the other hand, testified he did not know his wife had called the police after their argument, and that he was with a group of people under his carport after his wife left the residence. He contends he was doing laundry when Officer Kendrick arrived, and was taking clothes from the outside dryer back into the residence when Officer Kendrick first tried to speak with him. Malone claims that after he came back outside, Officer Kendrick drew his gun, pointed it at him, and ordered him to get on the ground and scoot toward the officer. Malone was then patted down, handcuffed, and placed in the back of the patrol car. Malone does not dispute that he had a small bag of marijuana in his pocket when he was taken into custody.

Sergeant Brunson arrived on the scene after Malone had been placed in the patrol car. After speaking to Officers Kendrick and Dixon, Sergeant Brunson proceeded to speak with Malone, who was still in the back seat of the patrol car. Sergeant Brunson testified that he was familiar with Malone because Malone "was a local in the area selling narcotics." (Id. at 81.) The nature of their conversation and the events that followed are disputed. Sergeant Brunson testified that he

> went to the patrol car. Advised [Malone] of the
> nature of why we were all there, what was going on.
> Advised that we were going to need to locate this
> weapon and try to resolve all this matter. I advised
> him of his Miranda rights. And he advised that he

-4-

understood, and he was willing to be cooperative.
(Id. at 80-81.) Sergeant Brunson reiterated on cross-examination that upon being read his Miranda rights, Malone responded "yes, I know my rights."[3] (Id. at 95.) According to Sergeant Brunson, Malone "advised that he put the gun in his house." (Id. at 81.) Sergeant Brunson "asked for consent to go retrieve that gun where the officers and I would have consent to go into the residence," and also "asked to search for weapons and narcotics." (Id.) Sergeant Brunson and Officer Kendrick both testified that Malone gave verbal consent to search the residence. Sergeant Brunson stated that "[w]e were given consent to search the house. We were given verbal consent more than once" and he told Malone "[y]ou know, we're going to take a quick peek. We're going to get this weapon. And everything that you say and do, I will let a judge and a prosecutor know." (Id. at 98). Officer Kendrick recalled that Malone was asked "[c]an we go get the gun, and is there anything else you want to tell us about as far as the marijuana or any other drugs," and that "[w]e asked [Malone] a very umbrella statement . . . are there any other guns or weapons involved in any of this? If so, let

---

[3]During this time, Officers Dixon and Kendrick were standing next to the patrol car. Officer Dixon testified that he heard Sergeant Brunson advise Malone of his Miranda rights. Officer Kendrick did not recall whether he heard Brunson advise Malone of his Miranda rights in the patrol car.

us know." (Id. at 48, 51.)   Sergeant Brunson testified that
Malone "appeared to have all his senses and faculties" and that
Malone advised the officers he was not "high" or impaired. (Id.
at 103-04.)  Officer Kendrick stated that Malone "did not appear
to be on anything.   He appeared to be normal." (Id. at 47.)
Officer Dixon remembered that he "had been close enough . . . to
notice [Malone's] behavior and stuff, and he didn't appear to be
high." (Id. at 72.)

Malone, on the other hand, testified that he was never
advised of his Miranda rights on July 13.   According to Malone,
Sergeant Brunson informed Malone that his wife had said that he
had a gun during the alleged assault, and Brunson "was saying
like he needed to get in the house to get that gun." (Id. at
114.)   Malone stated he was scared, and that his state of mind
regarding the search of the residence was "you the police, you
know.   You're going to do what you want to do anyway." (Id. at
114.)   Malone felt that the search was "[m]ore like a force
thing . . .   I mean, I'm going to do whatever the law tell me to
do as far – I'm not going to tell them no." (Id. at 115.)   He
also testified he was "high" that evening due to using cocaine
earlier and smoking marijuana right before his encounter with
the police. He further testified Sergeant Brunson told him that
he appeared to be "high."

Sergeant Brunson, Officer Kendrick, Officer Randy Akers,

-6-

and Malone went into the residence, while Officer Dixon stayed outside.[4] They entered the residence through the door located by the carport with Malone leading the way. Once inside, according to Sergeant Brunson, Malone "led us through the kitchen, down a hallway to the last room on your left." (Id. at 83.) Inside this room, the officers located two firearms, a Jimenez .380 caliber pistol and a Taurus .45 caliber pistol. According to Sergeant Brunson, when the Jimenez pistol was found, Malone stated, "oh, that's my gun." (Id. at 84.) The officers also found marijuana and crack cocaine during the search of the residence.[5] After the search, Malone was transported to the police station.

After carefully considering all of the testimony regarding the events of July 13, the court finds the testimony of the law enforcement officers to be credible. Consequently, the court finds Malone's testimony to be not credible to the extent it conflicts with the officers' testimony. Of particular importance, the court makes the following findings: Officers

---

[4]According to the testimony, Officer Akers was a Millington Police Department K-9 officer. It is not clear from the record exactly when Officer Akers arrived at the residence or whether he had his dog with him inside the residence during the search.

[5]Malone argues that the seizure of the drugs was also unconstitutional. The court need not address this particular challenge, because as the government indicated at the suppression hearing, the drugs found inside the residence will not be used at trial during the government's case-in-chief.

Kendrick and Dixon did not draw their weapons during their encounter with Malone on July 13; Sergeant Brunson verbally informed Malone of his <u>Miranda</u> rights and asked for consent to search the residence for weapons and narcotics while Malone was in the back of the patrol car;[6] Malone indicated he understood his <u>Miranda</u> rights and gave consent to search; and Malone was not visibly intoxicated or impaired at the time he gave consent and waived his <u>Miranda</u> rights.

**B.    The July 15, 2016 Interview**

On July 15, 2016, Sergeant Brunson and Detective Jeff Gibson interviewed Malone while he was in custody following his arrest on July 13. The interview was recorded on video, and portions of the video were played at the hearing. (Ex. 2.) During the interview, Malone was presented with a "Rights Waiver Form."[7] (Ex. 1.) The top of the form contains personal

---

[6]The credibility of Sergeant Brunson's testimony that he sought consent to search the residence for weapons and narcotics beyond the weapon allegedly involved in the domestic assault is buttressed by information known to Brunson prior to asking for consent to search. Sergeant Brunson testified he was familiar with Malone's involvement with drug trafficking activities in the past. The officers also found marijuana in Malone's pocket shortly before Sergeant Brunson's arrival. Thus, it was not unreasonable for Sergeant Brunson to ask for consent to search for more than just the firearm that first prompted the officers to come to the residence.

[7]Sergeant Brunson testified that the interview took place on the day after the arrest (July 14, 2016). However, the Rights Waiver Form executed by Malone during the interview is dated

information about Malone, and the date and time of the interview.[8]  Below this information, the form states, "[b]efore we ask you any questions, you must understand your rights." (Id.)  The form then lists the following rights, with each on a separate line:

You have the right to remain silent.

Anything you say can be used against you in court.

You have a right to talk to a lawyer for advice before we ask you any questions.

You have a right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(Id.)  Malone placed his initials beside each right.  Below these rights, under the heading WAIVER OF RIGHTS, the form states:

I have read this statement of my rights and I understand what my rights are.  No promises or threats have been made to me and no pressure, force, or coercion of any kind has been used against me.  At this time, I am ready to answer questions without a lawyer present.

(Id.)  Malone signed underneath the waiver of rights, and

---

Friday, July 15, 2016, and the officers state in the interview that it is taking place on Friday, July 15.

[8]According to the form, Malone was born in November 1982, and had obtained a G.E.D.

Sergeant Brunson and Detective Gibson signed as witnesses. At the end of the interview, Sergeant Brunson typed out a written statement for Malone to review and sign. The last paragraph of Malone's statement reads:

> I will now ask you to read this statement and if it is true and correct I will ask you to initial each page except the last. I will ask you to sign, date, and put the time on the last page. Do you understand?

(Id. at 3.) Malone placed his initials next to this statement, and signed directly below it.

## C. Motion to Suppress

In his Motion to Suppress, Malone contends that the officers conducted an illegal "constructive entry" into the residence through the use of overbearing tactics that essentially forced him out of the residence. However, following the proof at the hearing, Malone conceded that there was no constructive entry into the residence.[9] He asserts, rather, that he did not voluntarily consent to the search of the residence or, alternatively, that the officers exceeded the scope of the consent. Malone further contends any statements he made to police while in custody on July 13 and statements he made during the subsequent interview with Sergeant Brunson and Detective Gibson were obtained in violation of his Fifth Amendment rights.

---

[9]The court notes that the Record of Arrest states that after Malone entered the residence, "[o]fficers advised Malone to exit the residence." (Ex. 3.) This statement is contrary to the hearing testimony of Malone and the officers.

While he concedes that he was informed of and waived his <u>Miranda</u> rights during the July 15 interview, he argues that the alleged failure to advise him of his <u>Miranda</u> rights on July 13 renders both statements inadmissible.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Consent Search

Malone argues that because the search of his residence by the police on the night of July 13 violated his Fourth Amendment rights, the two firearms discovered during the search must be suppressed.  The government asserts that the search was constitutional because Malone voluntarily gave the officers consent to search.  Malone counters that any consent he gave was invalid because of coercion on the part of the officers, and because he was under the influence of marijuana and cocaine.  He also argues that, even if his consent is deemed voluntary, the police exceeded the scope of the consent.

#### 1.  <u>Voluntary Consent</u>

It is well-settled that "[p]olice officers do not need a warrant to search a home when the owner consents to the search." <u>United States v. Montgomery</u>, 621 F.3d 568, 571 (6th Cir. 2010) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)). "Where the validity of a search rests upon consent, the State has the burden of proving 'by a preponderance of the evidence' through 'clear and positive testimony' that the necessary

consent was freely and voluntarily obtained." United States v. Ward, 400 F. App'x 991, 995 (6th Cir. 2010) (quoting United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996)); see also Bumper v. North Carolina, 391 U.S. 543, 548 (1968). In determining whether a defendant's consent to search was given freely and voluntarily, "the court must examine 'the totality of the circumstances,' including 'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" Id. at 996 (quoting Riascos-Suarez, 73 F.3d at 625); see Schneckloth, 412 U.S. at 248. The Supreme Court made clear in Schneckloth that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." 412 U.S. at 227; see also United States v. Drayton, 536 U.S. 194, 206-07 (2002).

Examining the totality of the circumstances, the court finds that the government has shown by a preponderance of the evidence that Malone freely and voluntarily consented to a search of his residence. As the court previously found, Sergeant Brunson credibly testified that he asked Malone for consent to search the residence, and Malone verbally consented.

Malone was thirty-three years old and had obtained a G.E.D. There is nothing in the record to suggest that Malone's level of intelligence or any other individual characteristics would detract from his ability to consent to a search of the residence. The fact that Malone was in custody at the time he gave consent does not render his consent invalid. See United States v. Watson, 423 U.S. 411, 424 (1976) (noting that the defendant "had been arrested and was in custody, but his consent was given while on a public street, not in the confines of the police station" and that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"). While Malone testified that he felt forced to consent, there is no credible evidence that the officers took any actions that could objectively be seen as coercive. See United States v. Gossett, 600 F. App'x 330, 334 (6th Cir. 2015) (quoting United States v. Crowder, 62 F.3d 782, 787 (6th Cir. 1995) ("A 'defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police.'")). Sergeant Brunson did not affirmatively tell Malone that he had the right to refuse consent. However, given all the relevant considerations, this factor does not render the consent involuntary.

Malone also argues he was under the influence of marijuana and cocaine, which rendered him unable to give voluntary

-13-

consent.    The Sixth Circuit has explained that "in some settings, the influence of drugs . . . may tip the balance in favor of finding a lack of capacity to consent to the search." Montgomery, 621 F.3d at 572.    However, "*per se* rules are anathema to the Fourth Amendment," and "[d]rug-induced impairment . . . is a matter of degree, making it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play." Id. Accordingly, the court need not dwell on the more abstract question of whether Malone was under the influence of drugs when he gave consent, because there is no credible evidence that he was so impaired as to render his consent invalid.    While Malone testified that he was "high," Officer Kendrick, Officer Dixon, and Sergeant Brunson all testified that they did not notice any visible signs that Malone was intoxicated or impaired.    Under the totality of the circumstances, the consent Malone gave the officers was valid.

    2.    Scope

    Malone contends that even if he gave the officers valid consent to search, the officers exceeded the scope of that consent.    The standard for determining the scope of a consent search is objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimneno, 500 U.S. 248, 251 (1991) (internal citations omitted). "The scope of a search is

-14-

generally defined by its expressed object." Id. (citing United States v. Ross, 456 U.S. 798, 824 (1982)); see also Hall v. Sweet, 666 F. App'x 469, 475 (6th Cir. 2016) ("[A] search is not beyond the scope of consent when it was reasonable given its expressed object.").

After carefully considering the testimony, the court finds that the officers acted within the scope of Malone's consent when they discovered both of the firearms. The testimony of Sergeant Brunson, Officer Kendrick, Officer Dixon, and Malone indicates that the gun Malone allegedly possessed during the argument with his wife was the primary object of the search. However, Sergeant Brunson and Officer Kendrick also credibly testified that Sergeant Brunson sought consent to search for other weapons and narcotics as well. Because the guns were discovered in the course of a consensual search of the residence, the seizure of those firearms did not violate Malone's Fourth Amendment rights.

**B.  Statements**

Malone argues that any statements he made to the police while in custody on July 13 and during the July 15 interview should be suppressed at trial because he was not informed of his Miranda rights before making statements on July 13. "Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant

-15-

has first been apprized of the constitutional right against self-incrimination and has validly waived this right." United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (citing Miranda v. Arizona, 384 U.S. 436, 478-79 (1966)). A defendant's waiver of his right against self-incrimination "must be both knowing and voluntary." United States v. Anderson, 695 F.3d 390, 394 (6th Cir. 2012) (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)). "In other words, the waiver must be both 'the product of a free and deliberate choice rather than intimidation, coercion, or deception' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Moran, 475 U.S. at 421). The Supreme Court has explained that "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence," and that "a waiver of Miranda rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" Berghuis v. Thompkins, 560 U.S. 370, 384 (2010); see also United States v. Lawrence, 735 F.3d 385, 437 (6th Cir. 2013).

As noted above, the court credits Sergeant Brunson's testimony that he verbally informed Malone of his Miranda rights while Malone was in the back of the patrol car, Malone indicated he understood those rights, and there is no credible evidence

-16-

that Malone did not in fact understand his <u>Miranda</u> rights. Because Malone was properly informed of and understood his <u>Miranda</u> rights, to the extent he made inculpatory statements to the police, that course of conduct constitutes a waiver of those rights. Accordingly, the statements Malone made while in custody on July 13 and July 15 do not violate the Fifth Amendment.

### III.  RECOMMENDATION

For the reasons described above, it is recommended that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
_____
TU M. PHAM
United States Magistrate Judge

July 7, 2017
_____
Date

### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**